IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

YOUNG CHOI INC. dba KING'S      )        CIVIL NO. 08-00101 HG LEK
MARKET & LIQUOR,                )
                                )
            Plaintiff,          )
                                )
        vs.                     )
                                )
THE UNITED STATES OF AMERICA,   )
                                )
            Defendant.          )


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND**
**AFFIRMING THE UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD AND**
**NUTRITION SERVICE'S FINAL AGENCY DECISION, DATED FEBRUARY 21,**
**2008**

Plaintiff Young Choi, Inc., owner of King's Market & Liquor, brought this action for judicial review of the administrative decision by the Food and Nutrition Service of the United States Department of Agriculture to permanently disqualify Plaintiff from participation in the Food Stamp Program ("FSP") under the Food Stamp Act, 7 U.S.C. §§ 2011-2036 for trafficking in food stamps.

Defendant United States of America seeks summary judgment, based on the administrative record, requesting a ruling that Plaintiff violated the Food Stamp Program and that the sanction imposed was appropriate.  (Memo. in Support of Motion for Summary Judgment at 2, Doc. 31.)

For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment.

1

**PROCEDURAL HISTORY**

On June 3, 2008, Plaintiff filed the Second Amended Complaint.  (Doc. 12.)

On June 9, 2008, Defendant filed an answer.  (Doc. 14.)

On July 3, 2008, Defendant filed the administrative record. (Doc. 17.)

On November 21, 2008, Defendant filed a Motion For Summary Judgment, (Doc. 31), and a Separate and Concise Statement Of Facts In Support, (Doc. 32).

On January 14, 2009, Plaintiff filed the Disclosure Of Expert Testimony, (Doc. 40.), and the Declaration Of Frank K. Abou-Sayf, PhD Re Expert Testimony Report, (Doc. 41).

On January 22, 2009, Plaintiff filed an Opposition to the Defendant's motion for summary judgment.  (Doc. 42.)

On January 23, 2009, Plaintiff filed a Separate And Concise Statement Of Facts In Support Of Plaintiff's Opposition.  (Doc. 43.)

On January 29, 2009, Defendant filed a Reply brief.  (Doc. 29.)

On February 9, 2009, the matter came on for hearing.

**BACKGROUND**

**I. The Food Stamp Program**

The Food Stamp Program ("FSP") is a welfare program that allows low-income households to use coupons to purchase food from

2

authorized retail food stores.  7 U.S.C. § 2013(a).  The
Secretary of Agriculture issues regulations for the FSP and the
Department of Agriculture's Food and Nutrition Service ("FNS")
administers the program.  7 U.S.C. § 2013(c); Thabit v. United
States Department of Agriculture, 2003 WL 1798302, at *4
(N.D.Cal. April 3, 2003).

     Stores participating in the FSP must follow the regulations
of the program set in the *Code of Federal Regulations's*
"*Participation of Retail Food Stores, Wholesale Food Concerns and
Insured Financial Institutions.*"  See 7 C.F.R. § 278.  An
authorized store may only accept coupons from eligible households
in exchange for eligible food.  7 C.F.R. § 278.2(a).  Trafficking
food stamps is a violation of the program that involves "the
buying or selling of coupons, ATP cards or other benefit
instruments for cash or consideration other than eligible food
items."  7 C.F.R. § 271.2.  FNS may disqualify an authorized food
store from the program or impose a civil money penalty on a store
if FNS's on-site investigations, inconsistent redemption data, or
transaction reports under an EBT system shows that a store
violated the FSP.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a)

     FNS officers investigate possible food stamp violations
according to the guidelines outlined in the agency compliance
handbook.  Ameria Corp. v. Veneman, 347 F.Supp. 2d 225, 226
(M.D.N.C. 2004).  The compliance handbook is not a rule or

regulation of government agency that the government needs to disclose during judicial review.  See id. at 226-27 (denying motion to order government to produce compliance handbook in judicial review of government's finding that store trafficked in food stamps).

At the start of an administrative case, the local or regional FNS field officer sends the store a charge letter stating that FNS investigated the store for possible food stamp violations and detailing each alleged violation.  7 C.F.R. § 278.6(b).  FNS provides the store the opportunity to explain the transactions in question before FNS makes a final administrative determination.  7 C.F.R. § 278.6.  The store may submit information, explanations, or evidence concerning any instance of alleged noncompliance within ten days of receiving the charge letter.  Id.  In making its final decision, the regional FNS office reviews the letter of charges, the store's explanations, the nature and scope of the violations, any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and evidence that shows the firm's intent to violate the regulations.  Id.

A store disqualified or fined under the FSP may file a written request for an administrative review within ten days of receiving notice of the FNS's action.  7 C.F.R. § 279.1.  The lower administrative decision is suspended while the

4

administrative review officer reviews FNS's determination.  7
C.F.R. § 279.4.  The reviewing officer considers information
submitted by FNS, the store, and any other person who has
relevant information on the case.  7 C.F.R. § 279.4.  To
establish that a store violated the regulations of the FSP, FNS
must provide administrative records that show that the authorized
food store accepted food stamp coupons as payment for ineligible
items.  Wehab v. Yeutter, 743 F.Supp. 1353, 1357 (N.D.Cal. 1990).
The reviewing officer may uphold FNS's decision to disqualify or
fine a store if the store cannot reasonably explain the
suspicious patterns in the store's transactions.  See Kahin v.
United States, 101 F.Supp.2d 1299, 1301 (S.D.Cal. 2000)
(reviewing officer upheld disqualification as store could not
explain the difference in low inventory value and high food stamp
redemption, or provide store records to confirm alleged large
orders).

II.  **Electronic Benefit Transfer Program**

In Hawaii, the Food Stamp Program utilizes an Electronic
Benefit Transfer ("EBT") system, and food stamp benefit
recipients obtain their benefits through an EBT card.  The
plastic EBT cards have magnetic strips encoded with a card number
that is linked to the recipient's data.  A recipient uses an EBT
Card to pay for eligible food purchases at an authorized retail
food store by inserting the card into a point-of-sale device and

entering a personal identification number.

In an EBT transaction, a cashier rings up the total food purchase and swipes the food stamp recipient's card through the point-of-sale device. The recipient verifies the amount that will be debited from the account and enters their personal identification number to authorize the debit. The cashier next enters the amount of eligible food purchased. The point-of-sale device transmits the information on the sale to an associated host computer. The associated host computer is a central database that processes and stores the information.

If the EBT system authorizes the purchase, the purchase amount is debited from the recipient's account and credited to the retailer. A receipt is then printed showing the store number, the recipient's identification number, the amount of purchase, whether or not it was approved, and the balance of the recipient's account.

The EBT system enables the FNS to track benefits from the recipient to the retailer, recording information on each benefit transaction. The stored electronic data includes the recipient's card number, the amount of the food stamp purchase, the store number, and the date and time of the transaction. The electronic data logged provides a tool for identifying the type and pattern

6

of transaction indicative of food stamp trafficking.[1]

The Food Stamp Act expressly provides for the use of evidence obtained through a transaction report under an electronic benefit system.  7 U.S.C. § 2021(a).

## III.  **Plaintiff's Disqualification from the FSP**

Plaintiff Young Choi, Inc., is the owner and operator of King's Market & Liquor ("King's Market").  According to Plaintiff King's Market, it caters to the Micronesian community and sells food in bulk.  (Opp., Choi Decl. at ¶ 6, Doc. 42; Plaintiff's Separate Concise Statement of Facts in Opposition ("Pl. SCSF") at 2, Doc. 43.)  Plaintiff claims the top selling products at King's Market's include canned corned beef, chicken, pork, spam, vienna sausages, and 50lb. bags of rice.  (Administrative Record ("AR," at 176, Choi letter to FNS, Doc. 17.)  King's Market also states that it serves as a neighborhood convenience store that sells liquor and tobacco.  (Pl. SCSF at 2, Doc. 43.)

Defendant authorized King's Market to participate in the FSP on March 5, 2003.  (Alert Investigation Explanatory Notes ("Notes"), AR at 81.)  The FNS computer program known as the

---

[1]As stated in the Code of Federal Regulations: Trafficking means the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food; or the exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of Title 21, United States Code, for coupons.

7 C.F.R. 271.1

ALERT[2] program identified King's Market as a target for
investigation based on a suspicious pattern of transaction
activity.  The ALERT program identifies patterns such as multiple
withdrawals from the same food stamp recipient accounts within
short periods.  (<u>Id.</u>)  After the ALERT system identified King's
Market as a store to be investigated, the Honolulu Field Office
of the FNS analyzed King's Market's transaction history for
March, 2007, through August, 2007, and determined that
"suspicious patterns of transactions indicating a likelihood of
trafficking of food stamp benefits." (<u>Id.</u>)  Large consecutive
transactions from the accounts of more than one food stamp
recipient, multiple transactions from the same household
accounts, depletion of food stamp benefits through large
purchases, and high dollar food stamp transactions showed that
King's Market was engaged in food-stamp trafficking.  (<u>Id.</u>)

     Defendant conducted an ALERT site visit and FNS Store Survey
on September 27, 2007.  Defendant's Officer-in-Charge, Van
Cullumber ("OIC Cullumber") and Jane Dedrick, a FNS Program
Specialist, conducted the inspection of the store, with the
consent and cooperation of In Soo Choi, President of Young Choi
Inc., and Hee Jung Choi, Secretary of the corporation.  (AR at
222-225.)  OIC Cullumber reported that during the investigation,

---

[2]The ALERT program is the **A**nti-fraud **L**ocator using the
**E**lectronic Benefit Transfer **R**etailer **T**ransactions program.  (AR
at 81.)

he observed that King's Market is small, occupying about 1800 square feet, has only two cash registers and point-of-sale devices, limited counter space consisting of one 3' x 3' counter, no shopping carts, and only twelve shopping baskets. (Store Survey, AR at 222-225.)  The Market is located within eight blocks of two homeless shelters. (<u>Id.</u>)  OIC Cullumber found that on September 27, 2007, the Market stocked 40 boxes of frozen meat, pork and poultry items for sale in upright freezers; and had a good stock of canned meat and seafood.  The Market, however, had a limited supply of fresh produce, eggs, and dairy products; and no fresh meat, seafood or poultry. (<u>Id.</u>)  The larger  8' x 20' freezer in the back of the store contained very few frozen items. (<u>Id.</u>)

A large number of the transactions being investigated by the FNS were sales for food in amounts that were multiples of $34.99, and Defendant looked for eligible food items at King's Market that sold for that amount.  OIC Cullumber reported that there were none. (<u>Id.</u>)  The bulk foods that were sold consisted of meat and poultry sold at prices that did not match the $34.99 amount, including a case of canned corned beef for $35.99.

OIC Cullumber observed the King's Market had an excellent stock of ineligible items, including liquor, and a display case 7' tall x 24' wide fully stocked with beer and wine.  King's Market also had a stock of ineligible tobacco, clothing, and

9

other household items.  (Id.)  The FNS inspection did not find

any half or whole cases of canned corned beef.  The only cans of

corned beef seen were loose cans on one store shelf.  (Motion,

Declaration of OIC Van Cullumber ("Cullumber Decl.") at 3, Doc.

31.)  FNS concluded from the observations made during the on-site

store investigation and conversation on September 27, 2007, with

the owners that the store size, food stock, and prices were

inconsistent with the large purchases recorded by the EBT system.

(Id. at 3; Store Survey, AR at 225.)

On October 1, 2007, OIC Cullumber sent a letter of charges

to Plaintiff, detailing the reasons FNS believed the store had

violated the FSP regulations and was trafficking in food stamps.

(Charge Letter, AR at 198-199.)  The Defendant found that 426

transactions for $100 or more indicated food stamp trafficking by

the Market.  (Notes, AR at 82.)  The Charge Letter outlined the

suspicious transactions as including:

> 1. multiple withdrawals made from the accounts of
> multiple food stamp households within an unusually
> short time frame;
>
> 2. multiple withdrawals made from a single account
> within an unusually short time frame;
>
> 3. the completion of food stamp transactions that
> depleted the majority or all of a recipient's monthly
> food stamp benefit in an unusually short time frames;
> and
>
> 4. excessively large withdrawals made from the accounts
> of the food stamp recipients.

(Charge Letter, AR 198-199 "Government's four findings".)

FNS notified Plaintiff that Plaintiff could respond to the charges and request a civil money penalty within ten days of receiving the charge letter.  (Id.)

Plaintiff orally responded to the charges during a telephone call on October 3, 2007.  Young Sung Choi, son of the President of the corporation, denied that any employee of King's Market was involved in food stamp trafficking.  (Notes, AR at 87.)  Young Sung Choi explained that the large number of EBT transactions seen in re-occurring amounts in the charge letter resulted from the sale of multiple cases of canned corned beef at the price of $69.98 each.  When questioned about a single EBT transaction on July 3, 2007, in the amount of $1,259.64, Young Sung Choi maintained the transaction was for eighteen whole cases of canned corned beef at $69.98 per case.  (EBT Production System Balance Inquiry, AR at 96; EBT Exception Report, AR at 290.)

According to Young Ah Choi, daughter of the corporation's President, King's Market normally divided the $69.98 whole cases into half cases of 12 cans each.  The half case was then sold for $34.99.  (Notes, AR 86-86.)  The cases were repackaged into half cases because the weight of a whole case, 17.25 lbs., was too much for one person to carry.  (Id.)

Young Sung Choi went on to explain the instances where recipients purchased large dollar amounts and depleted the balances on their EBT cards.  He maintained that customers would

11

request the owners to deplete their balances, paying the
remainder in cash if the purchase of food exceeded the balance.
(Id.)  Plaintiff states the types of food stocked by King's
Market and the customer service provided by the store is the
reason King's Market has many dedicated food stamp customers,
including homeless individuals.  (Id. at 88.)

     The FNS Field Office requested receipts and invoices of
items purchased for King's Market and cash register tapes for the
period from March, 2007 through August, 2007.  (Id.)  On October
11, 2007, Plaintiff provided some invoices for corned beef
purchases, cash register receipts, and Hawaii General Excise Tax
Returns to justify some of the questioned EBT debits. (Notes, AR
at 87; Notice Of Permanent Disqualification Letter, dated
November 9, 2007 ("Disqualification Letter"), AR at 153.)  With
the consent of Plaintiff, FNS conducted another on-site
investigation of the Market on October 11, 2007.  (10/11/2007
Store Survey, AR 159-164.)  There were no cases or half cases of
corned beef in stock.  The only bulk food items for sale observed
on the October 11, 2007, inspection were boxes of frozen meats
ranging in price from $10.99 to $40.99.  (AR at 11.)

     The FNS Field Office verified that many of the Market's
customers who purchased food with EBT cards were homeless.
(Notes, AR at 82-85 and 88.)  Defendant confirmed that the
Institute for Human Services (IHS), a homeless shelter located

12

near the store, did not allow homeless individuals residing at IHS to bring in any food or store any food at the shelter.  (IHS Program Services pamphlet and Conversation Records, AR 155-157.)

Defendant obtained information on EBT purchases made by food stamp recipients who are listed as homeless and examined EBT transactions made by these recipients.  The FNS observed large dollar transactions made by homeless recipients.  The FNS Notes include several examples, including a homeless individual living at IHS, and a homeless family living on the beach.  On March 5, 2007, a homeless individual residing at IHS received food stamp benefits of $240.00.  On March 6, 2007, the individual's EBT account was debited $209.94 for six half cases of canned corned beef at King's Market.  (Notes, AR at 83.)

On May 31, 2007, a homeless family of nine living on the beaches of Oahu purchased eighteen half cases of canned corned beef at a price of $629.82.  The purchase reduced their benefits of $1,296.00 by nearly half.  Five minutes later, the family's EBT card was debited a further $174.95.  A few days later on June 8, 2007, the account was debited $629.82 for eighteen half cases of canned corned beef, and again five minutes later for $349.99. A month later, on July 3, 2007, the account was debited by $1,259.64, the sale price of thirty-six half cases of canned corned beef.  (Notes, AR at 83.)

After evaluating Plaintiff's reply and submissions the Food

13

and Nutrition Service (FNS) was not persuaded.  Defendant FNS
concluded that Plaintiff committed the violations outlined in the
Charge Letter.  (Notes, AR at 89.)  On November 9, 2007, FNS sent
a letter notifying Plaintiff that King's Market had been
permanently disqualified from the Food Stamp Program for
trafficking violations.  (Disqualification Letter, AR 153-154.)
Plaintiff did not request a civil money penalty in lieu of
permanent disqualification.  (Id.)

On November 19, 2007, Plaintiff submitted a timely request
for an administrative review of Defendant's decision to
permanently disqualify Plaintiff from participation in the FSP.
(Final Agency Decision, AR at 8.)

On February 21, 2008, the administrative review branch of
the U.S. Department of Agriculture, Food and Nutrition Service
issued a Final Agency Decision upholding: (1) Defendant's finding
that Plaintiff had violated the Food Stamp Act, and (2) the
decision to permanently disqualify Plaintiff from the FSP.
(Final Agency Decision, AR at 7-14.)

Pursuant to Section 14 of The Food Stamp Act (7 U.S.C. §
2023) and 7 C.F.R. 279.7 of the Code of Federal Regulations,
Plaintiff filed a timely claim on March 18, 2008, seeking
judicial review of the Administrative Review's Final Agency
Decision to permanently disqualify Plaintiff from participating
in the FSP.  (Complaint, Doc. 1.)  Plaintiff argues that

14

Defendant's evidence does not establish misconduct.  (Id. at 3.)

### STANDARD OF REVIEW

A grocery store fined or disqualified under the FSP after an administrative review may file a complaint in the federal district court to challenge the administrative review officer's decision that the store violated the FSP.  7 U.S.C. § 2023(a)(13).  If the administrative action is invalid, the court will enter a "judgment or order as it determines is in accordance with the law and the evidence."  7 U.S.C. § 2023(a)(16).   A judicial review of an administrative decision involving the FSP "[i]nvolves two questions: (1) Did the violation occur? and (2) Is the penalty valid?"  Plaid Pantry Stores, Inc. v. United States, 799 F.2d 560, 563 (9th Cir. 1986).

### I. Review of FSP violation

"The suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue."  7 U.S.C. § 2013(a).  District courts in the Ninth Circuit review the validity of FNS's finding that a store violated the FSP by a trial de novo.  7 U.S.C. § 2023(a)(15); Wong v. United States, 859 F.2d 129, 132 (9th Cir. 1988).  Unlike the "substantial evidence" standard under the Administrative Procedure Act, the court can look beyond the administrative record and reach its own factual and legal conclusions in a trial de novo.  Kahin, 101

15

F.Supp.2d at 1302 (citing <u>Ramirez v. United States</u>, 514 F.Supp. 759, 763 (D.P.R.1981)).  A trial <i>de novo</i> satisfies procedural due process because the parties are not limited to the contents of the administrative record.  <u>Kim v. United States</u>, 121 F.3d 1269, 1274 (9th Cir. 1997).

In a trial <i>de novo</i>, the burden of proof shifts, "[a]nd plaintiffs must establish by a preponderance of the evidence that the violations did not occur." <u>Lopez v. United States</u>, 962 F.Supp. 1225, 1228 (N.D.Cal. 1997) (citing <u>Goodman v. United States</u>, 518 F.2d 505, 511-12 (5th Cir. 1975)).

## II. <u>Severity of the Penalty</u>

District courts in the Ninth Circuit apply <i>de novo</i> review to FNS's finding that a store violated the FSP, but an arbitrary and capricious standard to the FNS's sanction imposed on a store. <u>Wong</u>, 859 F.2d at 132; <u>Lopez</u>, 962 F.Supp. at 1230.  If the court finds a valid violation under the FSP, it reviews the penalty FNS imposed on the store based on an arbitrary and capricious standard.  <u>Id.</u>  The court examines the penalty "[i]n light of the administrative record to judge if the agency properly applied the regulations; to determine whether the sanction is 'unwarranted in law . . . or without justification in fact' (citation omitted)." <u>Plaid Pantry Stores, Inc.</u>, 799 F.2d at 563.  The court may impose a different penalty if it finds that a sanction is unwarranted in law or without justification in fact.  <u>Wehab</u>, 743 F.Supp. at

1358.

FNS may permanently disqualify a store from the program for a third disqualification, or a first or subsequent occasion "[o]f a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store." Id. In lieu of a permanent disqualification, FNS may impose a civil money penalty of up to $20,000 for each violation, but no more than $40,000 for a single investigation. Id. To request a fine rather than endure permanent disqualification, the store must submit, within ten days of receiving the charge letter, substantial evidence that the store had an effective policy to prevent violations of the FSP. Id. The evidence must show that the store owner "[w]as not aware of, did not approve of, did not benefit from, or was not involved in the conduct of the violation." Id. The evidence must also show that "[t]he management was aware of, approved of, benefitted from, or was involved in the conduct of no more than 1 previous violation by the store." Id.

## III. **Summary Judgment**

On motion for summary judgment, the moving party retains the burden of showing that there is no genuine issue as to material fact and that it is entitled to judgment as a matter of law. Lopez, 962 F.Supp. 1225 at 1228. The burden initially lies with the moving party to identify for the court "those portions of the

17

materials on file that it believes demonstrate the absence of any genuine issue of material fact." <u>T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323). FNS does not need to provide evidence that a store was caught "red-handed" engaging in a food stamp violation in the summary judgment stage. <u>Kahin</u>, 101 F.Supp.2d at 1303. The court may grant the government's motion for summary judgment based on evidence from transaction reports. <u>Id.</u> at 1304.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). To defeat a motion for summary judgment, the nonmoving party needs to raise material issues of fact to every alleged violation charged against it. <u>Kahin</u>, 101 F.Supp.2d at 1303. Although the nonmoving party does not need to demonstrate by a preponderance of the evidence that the violations in question did not occur, it must produce at least some "significant probative evidence tending to support the complaint" must be produced. <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)); <u>Thabit</u>, 2003 WL 1798302, at *4. The nonmoving party may offer declarations or exhibits as new evidence to raise material issues of fact for each transaction

18

FNS alleges as suspicious.  <u>Kahin</u>, 101 F.Supp.2d at 1303.

Generalized and somewhat more specific assertions may not show

disputed issues of material fact to rebut the specific statements

and observations of investigators.  <u>See</u> <u>Thabit</u>, 2003 WL 1798302,

at *4 (generalized assertion that a violation was against policy

and the somewhat more specific assertion that there was no

surplus in the cash register failed to show a disputed issue of

material fact).

**<u>ANALYSIS</u>**

**I.**   **<u>Defendant Is Entitled To Summary Judgment On The Issue of Plaintiff's FSP Violation</u>**

Plaintiff's store, King's Market, has been permanently

disqualified by FNS because they found that Plaintiff trafficked

in food stamps.  Pursuant to 7 U.S.C. § 2021(b)(3)(B), permanent

disqualification is required "on the first occasion or any

subsequent occasion of a disqualification based on the purchase

of coupons or trafficking in coupons or authorization cards by a

retail food store."  In order to establish that Plaintiff

violated the regulation, the Defendant must show that Plaintiff's

store redeemed food stamp coupons for consideration other than

eligible food.  <u>Wehab</u>, 743 F.Supp. at 1357.

FNS relied on EBT electronic data documented in the

administrative record as a basis for finding that Plaintiff

violated the FSP by engaging in the trafficking of food stamp

benefits.  The administrative record shows that Defendant

19

submitted 426 transactions recorded at Plaintiff's store between
March, 2007, and August, 2007, that show rapid and multiple
transactions, large withdrawals, and transactions that depleted
customers' available food stamp balances.

Reports from two on-site investigation visits of Plaintiff's
Market also support FNS's position that Plaintiff engaged in
trafficking in food stamps.  The on-site evaluation reports note
that the store's small size, limited counter space, two cash
registers and EBT devices, twelve shopping baskets, and lack of
shopping carts would limit the size and speed of transactions.
(Store Survey, AR at 222-225.)  The prices, stock of foods, and
size of the Market are inconsistent with the excessively high
number of large EBT transactions.

As Defendant has met its initial burden, the burden now
shifts to Plaintiff.  In order to preclude summary judgment,
Plaintiff must raise material issues of fact as to each of the
violations charged against King's Market.  See Kahin, 101
F.Supp.2d at 1303.

Plaintiff has failed to provide evidence to explain the more
than 400 suspicious transactions.

### A.  **Electronic Benefit Transfer Transactions**

Plaintiff's first argument, that Defendant may not properly
rely on the EBT sales transactions in making its determination
that Plaintiff violated the FSP, is unpersuasive.  The law is

clear that FNS may base its finding of a violation on analysis of EBT transaction reports or on-site store surveys.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a)[3]; see Kahin, 101 F.Supp.2d at 1303 (affirming FNS's finding that store trafficked food stamps based on irregular and inexplicable patterns in EBT data and the volume of transactions compared to store inventory).

The administrative review officer correctly concluded that the use of EBT data and information obtained during the two store visits "is as valid a means of establishing facts as direct evidence obtained through an on-site investigation and the eye witnessing of trafficking."  (Final Agency Decision, AR at 10.)

**B.**   **Micronesian Customers and the Inventory of Corned Beef**

Plaintiff next argues that the pattern of transactions is explained by the ethnic background of the Market's customers.  In his Declaration, In Soo Choi asserts the questioned transactions occurred largely because his Micronesian customers eat canned corned beef and prefer to purchase the canned meat in large quantities.  (Opp., Choi Decl. at ¶ 6, Doc. 42.)  Choi's Declaration presents no facts directly rebutting the observations

---

[3]7 C.F.R. § 278.6 of the FSP regulations, which establishes the authority upon which FNS may disqualify any authorized retail food store, reads, in part:

>  Such disqualification shall result from a finding of a violation on the basis of evidence that my include . . . evidence obtained through a transaction report under an electronic benefit transfer system.

21

and analysis of FNS's investigators.  Choi merely presents
general justifications for large expenditures.

A similar argument was unsuccessfully put forward in the
case of <u>Kahin v. United States</u>, 101 F.Supp.2d 1299 (S.D.Cal.
2000).  <u>Kahin</u> also involved a store's permanent disqualification
from the food stamp program based on evidence of irregular and
inexplicable patterns in EBT data.  In <u>Kahin</u>, the FNS identified
EBT transactions occurring at plaintiff's grocery store revealing
"(1) rapid, repetitive electronic debits in unreasonable time
periods, (2) excessively high numbers of EBT debits of round
dollar amounts, (3) a high number of balance depletion
transactions, and (4) electronic card debits in large dollar
amounts."  <u>Id.</u> at 1300.  The charge letter noted that the FNS had
verified that the store was a small one, as is King's Market.
The store in <u>Kahin</u> "had no shopping carts, one cash register and
limited stock which could not sustain the type of transactions
recorded in the EBT data." <u>Id.</u>

The <u>Kahin</u> plaintiff argued that the suspect EBT data was a
result of "somewhat unusual purchasing patterns" of its Somali
customers.  Plaintiff alleged that the questionable transactions
were a consequence of Somali customers telephoning the store with
their orders at the beginning of the month.  Several families
then arrived at the store together, sharing transportation, to
pick up their pre-packaged groceries.  The simultaneous arrival

22

resulted in rapid, repetitive transactions.  Id. at 1301.
Plaintiff also alleged that the "Somali families are unusually
large, purchase food products in bulk, and purchase their entire
monthly food supply at the beginning of the month when the food
stamps are first available; thereby explaining the large
transactions and balance depletions."  Id.

The court in Kahin found the arguments to be insufficient
upon judicial review.  The court stated that in order to avoid
summary judgment, plaintiff had to raise material issues of fact
as to each of the violations charged against the store.  The
Plaintiff in Kahin argued that "the FNS's failure to produce
evidence indicating that [the] store was caught 'red-handed'
engaging in food stamp or EBT card fraud precludes summary
judgment."  Id.  The Kahin court rejected the assertion and
determined that while Plaintiff's explanations about the spending
patterns of his Somali customers tended to negate some of the
inferences from the EBT data, they did not sufficiently account
for all the suspicious activity.  Id.

Here too, the arguments about the shopping and eating
patterns of Micronesian people are insufficient to preclude
summary judgment.  Plaintiff's explanations focus on the sale of
corned beef to Micronesian customers.  The ethnicity of King's
Market's customers does not sufficiently account for all the
questioned transactions.  Ethnicity does not explain, for

example, why many rapid consecutive purchases were made by the same recipient.  Plaintiff asserts the consecutive purchases resulted from balance checks, where the recipient would purchase some food in order the check the balance on their EBT card, followed by another purchase when the balance allowed the sale. The explanation does not provide for the several transactions where the first purchase was in an amount well over $100, and was followed almost immediately by another transaction over $100.

The administrative review officer noted one such set of transactions where the recipient "made an initial transaction of exactly $120 followed only 1 minute 37 seconds later by a transaction for exactly $100."  (AR at 12.)  The two transactions were not in amounts that were multiples of $34.99, the price of a half case of corned beef.  The transactions also did not occur far enough apart in time.  The recipient, after completing the first purchase, would have had to pick up additional cases of canned corned beef and other food in a store with no carts in time to complete a second EBT transaction within 97 seconds. Plaintiff fails to provide specific facts showing how such sales could have occurred in a store where the transaction time alone was observed to take five minutes for a purchase of goods totaling $100 or more.  (Store Survey, AR at 222.)

Plaintiff proffers a receipt showing King's Market purchased $63,294 of canned corned beef from a distributor in support of

the argument that ethnic sales explain the questionable
transactions.  Plaintiff contends that the sale of the beef, sold
at a markup price for a total of $65,762, shows that the
transactions were normal purchases by Micronesian customers.  The
Market's EBT sales during the March through August 2007, period
total $207,381.  The corned beef sales do not account for the
remaining EBT sales totaling $141,619.  (Final Agency Decision,
AR at 11.)  The corned beef sales also do not account for the
forty-two EBT transactions for $109.96, a number that is not a
multiple of the canned corned beef price of $69.98 a case.
(Notes, AR at 82.)  The FNS EBT data also shows that of the 426
questionable EBT transactions, only 228 can be attributed to the
alleged bulk canned corned beef sales.  Plaintiff fails to offer
any explanation for the remaining 198 questionable transactions.
(Notes, AR at 89; Charge Letter, Attachment 7 at 212-221.)

     The evidence submitted by Plaintiff to refute Defendant's
charges falls far short of establishing legitimacy for a
significant majority of the transactions questioned.  Plaintiff
fails to meet its burden because it has not explained the
transactions or raised a material issue of fact with respect to
them.

     C.    **The Statistics Report**

     Plaintiff proffers a statistical analysis report by Frank K.
Abou-Sayf, PhD in support of the position that King's Market was

not involved in food trafficking.  (Statistical Report, Doc. 41
("Opinion Report".)  The Opinion Report offers no new evidence,
and fails to raise an issue of material fact for five separate
reasons: 1) it does not address the majority of the suspicious
transactions, 2) it is based on limited data, 3) it does not
directly refute the results of the Government's ALERT analysis,
4) it provides only conclusory statements rather than showing any
valid statistical analysis, and 5) it fails to address the
observations made by the Government during the on site inspection
of King's Market.

### 1. The Majority of the 601 Transactions Relied On By The Administrative Hearings Officer Are Not Addressed

First, Dr. Abou-Sayf discusses a very limited number of the
suspicious transactions documented by the Government.  In the
attachments to the government's Alert Investigation Explanatory
Notes dated November 19, 2007, 601 transactions are flagged as
suspicious.  (11/19/2007 Notes, AR 81-150, "ALERT Notes".)[4]  Dr.

_____

[4]There is some confusion created as to what data the Opinion
Report references.  In the Opinion Report, Dr. Abou-Sayf states
that he discusses the data documented in the attachments to the
October 1, 2007 letter from the United States Department of
Agriculture to In Soo Choi.  (See Opinion Report at 2, Doc. 41,
referring to the 10/1/2007 Letter, AR 198-342.)  Dr. Abou-Sayf
identifies the data, however, as being labeled "'Hawaii EBT
Production System - Balance Inquiry' dated 09/27/07 and hand-
labeled 'Att. B' through 'Att. K'" as the comparative reports
that he utilized in his examination.  The description matches the
documents attached to the ALERT Notes, found in the
administrative record at AR 81-150 ("Comparative Reports").
There are seventy-three EBT transactions at King's Market listed

Abou-Sayf refers to only seventy-three transactions.  The remaining 528 transactions are not discussed.  To defeat a motion for summary judgment, the nonmoving party needs to raise material issues of fact to *every alleged violation charged* against it. <u>Kahin</u>, 101 F.Supp.2d at 1303.  The Administrative Review Officer based Plaintiff's disqualification from the FSP on each on the 601 transactions.  The Opinion Report fails to create an issue of fact for all of the transactions, and summary judgment in favor of the Government is warranted.

### 2.   <u>Limited Data</u>

Second, in the introduction to the Opinion Report Dr. Abou-Sayf states that the reliability of his analysis is undermined because of the limited amount of data made available to him. Specifically, he warns that "[a] thorough verification of many of the Defendant's claims is not possible in many instances due to the limited amount of data provided by Plaintiff [King's Market] to Defendant."  (Opinion Report at 1, Doc. 41.)

### 3.   <u>The EBT Data Analysis Is Not Addressed</u>

Dr. Abou-Sayf's main assertion is that other methods of statistical analysis of the limited data, substituted for the ALERT analysis, may be used to call into question the Government's findings *without ever directly refuting the EBT data analysis*.  Dr. Abou-Sayf's central contention is unpersuasive.

---

in the Comparative Reports.

The Food Stamp Act expressly provides for permanent disqualification of a retail food store using EBT evidence alone to support a finding of trafficking.  See 7 U.S.C. § 2021(a) (explicitly recognizing the validity of relying on evidence garnered "through a transaction report under an electronic benefit transfer system"); see also 7 C.F.R. § 278.6(a) (a store may be disqualified on the basis of "evidence obtained through a transaction report under an electronic benefit transfer system.").

Courts have upheld a store's disqualification from the food stamp program based on an analysis of EBT system data, similar to the government's analysis here.  Idias v. United States, 359 F.3d 695, 698 (4th Cir. 2004) (upholding disqualification when the United States "presented evidence of a pattern of irregular and suspicious activity, including that (1) on several occasions, total food stamp debits exceeded the store's documented total sales; (2) total food stamp debits systematically exceeded the sales categorized as food stamp sales on the store's register tapes; and (3) large food stamp debits often occurred in quick succession, sometimes even using the same EBT card, despite the Supermarket's modest size."); Saleh v. United States, No. 02 C 8846, 2004 WL 549457, at * 1–3 (N.D.Ill. March 19, 2004) (upholding disqualification because "[t]he high number of high dollar value EBT transactions at [the store] was excessively high

for such a small store with few food stamp eligible items.");
Kahin v. United States, 101 F.Supp.2d 1299, 1303-04 (S.D.Cal.
2000) (upholding disqualification of a small store with limited
stock when there was "rapid, repetitive transactions to the same
customer indicated in the EBT data.").

Dr. Abou-Sayf's assertion that other methods of statistical
analysis are to be substituted for EBT analysis does not negate
the government's findings.

### 4.   The Opinion Report Is Conclusory

In the remainder of the Opinion Report, Dr. Abou-Sayf
discusses three of the Government's four findings, and a finding
by the Administrative Review Officer, by analyzing a handful of
the questioned food-stamp transactions.

### a.   Chi-Square Analysis Of Multiple Transactions

In the first section, Dr. Abou-Sayf discusses the
Government's first finding that multiple withdrawals were made
from the accounts of multiple foodstamp households within
unusually short time frames.  (Gov. findings, 10/1/2007 Letter,
AR 198; Opinion Report at 3, Doc. 41.)  Dr. Abou-Sayf states that
he examined the finding using Chi-Square analysis.  He purports
to provide the details of his analysis in Appendix 1 to the
Opinion Report.

A Chi-Square goodness of fit test is one technique for
testing a hypothesis, fitting a statistical model to observed

data.  For example, if a six sided die is fair, the expected probability of rolling a 6 on any given toss is 1/6.  The hypothesis that a die is fair might be tested against an alternate hypothesis that the die has been weighted to favor rolling a 6, using a Chi-Square test.  The die is then rolled to obtain a sampling, or set of values.  After rolling the die a number of times, the Chi-square value would tend to agree with one hypothesis or the other.

Here, the analysis completed by Dr. Abou-Sayf is unpersuasive for several reasons.  First, it is unclear that he is referring to relevant data because two of the transactions listed in Appendix 1 to the Opinion Report are for transactions that occurred in 2008, outside the relevant time period.  (Opinion Report at 6, Doc. 41.)

Second, the Opinion Report never sets out a clear statement of any alternative hypotheses being tested in the Chi Square analysis.  The discussion implies that Dr. Abou-Sayf is assuming that the occurrences of multiple transactions should be similar at different stores, but implication is not enough.  A Chi Square test is meaningless without an alternate hypothesis.

Third, Dr. Abou-Sayf restates the Government's finding in such an altered way that his analysis does not address the finding.  In a straw man logical fallacy, Dr. Abou-Sayf states that he analyzed the comparative reports of ten food stamp

30

recipients to verify "the claim that *more* multiple transactions
by all 10 recipients within a short period of time *were made at
King's Market than at other markets*." (Opinion Report at 3, Doc.
41; <u>see also</u> Hawaii EBT Production System - Balance Inquiry dated
09/27/07, Att. B through Att. K to the ALERT Notes, AR 81-150
("Comparative Reports").) Dr. Abou-Sayf has rephrased the
finding so that he is comparing instances of repetitive purchases
by a single beneficiary with instances of repetitive purchases by
the same recipient at other stores, and testing to see if more
multiple purchases were made at other stores than at King's.
This is not an examination of the Government's finding that
multiple transactions were made by *multiple* food stamp recipients
*at King's Market.*

The Government supports its finding with the transactions
listed in Attachments 1 and 2 to the October 1, 2007, letter to
In Soo Choi. The Attachments show multiple transactions made by
multiple food stamp beneficiaries at King's Market. Dr. Abou-
Sayf does not refer to the data in Attachments 1 and 2, using the
data in the Comparison Reports instead. He analyzes multiple
transactions by a single beneficiary, rather than multiple
transactions by multiple beneficiaries. The transaction data
consists of ten separate reports, each detailing the purchases
made by an individual beneficiary at several different stores.
(<u>See</u> Comparative Reports, AR 91-150; Opinion Report at 3 and 6-

31

8.)  Dr. Abou-Sayf is, because of his choice of data, analyzing a smaller set of transactions.  Listing multiple transactions by a single beneficiary forms a smaller set of data than multiple transactions by multiple beneficiaries.  The approach does not address the suspicious nature of the multiple transactions *at King's Market* relied on by the Administrative Review Officer in his decision.

Dr. Abou-Sayf argues that the data studied in isolation sheds light on the behavior of the purchasers.  He relies on the assumption that the other transactions reflect normal behavior on both the buyer's and the store's part, and concludes that the purchases at King's Market are a part of a normal pattern of reasonable shopping behavior simply because similar repetitive purchases occurred at other stores.  Dr. Abou-Sayf's reasoning is circular and unpersuasive.

Dr. Abou-Sayf also fails to set out the mathematical analysis behind his conclusions.  Appendix 1 contains insufficient detail to act as a proof of his assertions.  The Opinion Report Chi Square discussion is conclusory and fails to raise an issue of material fact.

### b.  Poisson Probability Distribution Analysis

In Dr. Abou-Sayf's second section, he purports to employ the Poisson Probability Distribution analysis to show that multiple transactions within short periods of time by a single food stamp

32

recipient are part of a normal shopping pattern.  Again, there is a problem as to the Opinion Report as it references forty-nine of the transactions listed in Appendix 2 to the Opinion Report that are for transactions that occurred in 2008, outside the relevant time period.  (Opinion Report at 9, Doc. 41.)

Even if a relevant period of transactions was analyzed, the theory is unpersuasive here.  In probability theory and statistics, the Poisson Distribution provides the means to calculate the probability for a certain number of events to happen in a set time period, given the events are discrete and occur independently.  For example, the expected number of car accidents on a particular highway over a certain period of time can be calculated, assuming relatively constant conditions.  Similarly, Poisson Distribution can be used to determine the likely number of occurrences of a rare disease such as Leukemia in a certain population.

Poisson Distribution analysis is effective only when certain conditions are met, that is, 1) the number of events in two disjoint time intervals is independent; and 2) the probability of an event occurring during a small time interval is proportional to and only depends on the length of the time interval.  The Poisson Distribution is not applicable to situations where the events are not independent, such as the determination of the occurrences of AIDS in a population.  AIDS is an infectious

33

disease and so the contraction of AIDS by one person is not
independent of the contraction of the disease by others.

The usefulness of any conclusions reached in a statistical
analysis of any type of data depends on the quality of the data
used and the assumptions made.  Here, the assumptions are deeply
flawed.  Dr. Abou-Sayif assumes the two conditions, including
independence, that would dictate using a Poisson Distribution for
an analysis.

In particular, Dr. Abou-Sayif assumes that the occurrence of
multiple transactions within five or ten minutes "is independent
of the occurrence of another similar one."  (Opinion Report at 9,
Doc. 41.)  He gives no basis for the critical assumption.  Dr.
Abou-Sayf fails to show that the purchases qualify as a Poisson
process by fitting the transaction data to a Poisson distribution
and demonstrating that any deviations from the distribution
parameter are statistically reasonable.  The calculations are not
given in the Report.  Nor does Dr. Abou-Sayf demonstrate in some
other way that the two conditions of a Poisson process are met.

The Opinion Report is also unpersuasive because the data
used includes purchases at large supermarkets, such as Foodland
and Safeway, that have multiple cash registers, a large number of
customers, and a much wider stock of goods than is found at
King's Market.  In a Poisson process, data from other stores has
no relevance to data from King's Market unless the stores are

similar.  Using data from stores that are not similar is, for example, like using the data from a highway to determine the probability of traffic accidents on a country road.  Here, the on site investigations of King's Market detail reasons why purchasing patterns at King's would *not* be the same as at the stores referred to in the second section of the Opinion Report. Unlike Foodland and Safeway, King's Market is a small 1800 square foot store with only two cash registers and point-of-sale devices, and a limited stock of food for sale.

Dr. Abou-Sayf fails to show mathematically that the suspicious transactions are independent purchases that reflect normal shopping behavior, rather than food trafficking.  There is nothing in the Opinion Report demonstrating that the multiple transactions are random, independent transactions.  Dr. Abou-Sayf's conclusory statements fail to raise an issue of material fact.

### c.   Transactions Depleting Benefits

In the third section of the Opinion Report, Plaintiff's expert discusses the Government's finding that King's Market completed food stamp transactions that depleted the majority or all of a recipient's monthly food stamp benefit.  (Opinion Report at 4, Doc. 41.)  Dr. Abou-Sayf's opinion on the Government's third finding is also unpersuasive.

The Government proffered evidence of 142 suspicious

depletion and near depletion transactions in support of their finding.  (EBT transactions, Attachments 5 and 6, 10/1/2007 Letter, AR 205-211.)  Dr. Abou-Sayf addresses none of them.

Dr. Abou-Sayf examines, instead, seven large purchases made at King's Market.  He then compares the transactions to seventeen purchases made at other stores.  The total of twenty-four purchases were made by two of the food stamp recipients.  Six transactions were completed by recipient Shaver at Safeway, and eighteen transactions by recipient Kam, including the seven at King's Market.  The seven King's Market transactions are not relevant as they are *not* transactions listed by the Government in support of the finding of suspicious depletion of benefits.

The Opinion Report does not address the suspicious transactions directly, and fails to give any explanation for the depletion transactions.  Dr. Abou-Sayf argues only that because other large purchases were made at other stores, the three large purchases at King's Market exhibit normal behavior.  His opinion is conclusory and unfounded.

Plaintiff must raise material issues of fact as to every alleged violation charged.  <u>Kahin</u>, 101 F.Supp.2d at 1303.  The Opinion Report fails to raise a material issue of fact regarding the 142 transactions that depleted the majority of a recipient's monthly food stamp benefit.  Each of the 142 flagged transactions is sufficient to warrant summary judgment in favor of the

Government.

### d. **Excessively Large Withdrawal Transactions**

The final section of the Opinion Report discusses the
Administrative Review Officer's finding that a number of
recipient households spent substantially more of their food stamp
benefits at King's Market than at other stores and supermarkets.
(2/21/2008 Final Agency Decision at 5, AR 11.)  The
Administrative Review Officer found that the pattern of
recipients spending more of their allotment at the small King's
Market, than at supermarkets that carry more of a variety of
eligible foods, is indicative of unreasonable customer behavior.
Id.  Dr. Abou-Sayf agrees with the finding, stating that:

> Overall, the claim that some recipients spend
> substantially more at King's Market than at other
> markets is valid for 7 out of 10 recipients making up
> the comparative reports.  For the three others, more
> money was spent at King's Market half of the time,
> about three of the six months.

(Opinion Report at 5, Doc. 41.)

The Opinion Report fails to directly address the
Government's fourth finding, set out in the October 1, 2007,
letter to In Soo Choi, that a series of food stamp transactions
at King's Market resulted in excessively large withdrawals from
the accounts of food stamp recipients.  The Government proffered
426 suspicious excessive withdrawal transactions.  Dr. Abou-Sayf
fails to address the majority of them, discussing only the few

37

purchases listed in the Comparative Reports.

### 5.   The Analysis Fails To Address The On Site Observations

The Opinion Report only discusses the EBT data reports.  The Government's findings are not based on the EBT data analysis alone.  The Opinion Report does not consider the observations made by the Government during the on site inspections of King's Market, or the information gathered in the Government's investigation of the food stamp recipients who made the suspicious purchases.

The Opinion Report fails, for example, to explain why homeless food stamp recipients who live at IHS would buy large quantities of canned meat when they have no place to store food.

In Appendix 1 of the Opinion Report, Dr. Abou-Sayf examines multiple transactions made within four minutes by food stamp recipient Brown, a homeless family of nine living on the beaches of Oahu.  (Opinion Report at 6, Doc. 41.)  Dr. Abou-Sayf lists the family's multiple transactions at other stores, and concludes that the transactions show that Brown's multiple purchases on June 8, 2007, are part of a normal pattern of shopping behavior.

Dr. Abou-Sayf's conclusory report fails to explain why the Brown family would travel the long distance from the beaches in Waianae to King's Market in Kalihi to purchase 72 half cases of canned corned beef within a five week period from May 31, 2007,

38

to July 3, 2007.  (Notes, AR at 83.)

Nor does the Report explain how on March 15, 2007, a food stamp recipient made two purchases for $209.94 and for $104.97 within two minutes and twenty-three seconds, when the on site government inspectors observed that EBT transactions for $100 or more took five minutes in King's Market.  (Charge Letter, Attachment 3, AR at 203; Store Survey, AR at 222.)

Dr. Abou-Sayf's analysis does not establish an alternative explanation, other than food stamp trafficking.

The Court grants summary judgment in Defendant's favor as to the agency's finding that Plaintiff unlawfully trafficked in food stamps.

## II.  **The Law and the Facts Support the Administrative Decision and the Sanction Imposed**

As the Court finds that Plaintiff violated the FSP, the court also examines the sanction Defendant imposed on Plaintiff. See Wong, 859 F.2d at 132.  FNS may permanently disqualify a retail food store from the Food Stamp Program if FNS's on-site investigations, inconsistent redemption data, or EBT transaction reports show that a store violated the FSP.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a).  A store may submit a request of a civil money penalty in lieu of permanent disqualification, within ten days of receiving the charge letter.  Id.  A store owner who does not timely request a civil money penalty in lieu of a permanent disqualification cannot avoid the permanent disqualification.

See 7 C.F.R. § 278.6(I); United States v. Truong, 860 F. Supp. 1137, 1141 (E.D.La. 1994).

In applying the arbitrary and capricious standard, the Court finds that the agency's decision to permanently disqualify Plaintiff from the FSP for trafficking in food stamps is supported by the record.  The administrative record shows that Plaintiff was engaged in multiple violations of trafficking from March 2007 through August 2007.  In this circumstance, the statutes and regulations require permanent disqualification. Moreover, even if a civil monetary penalty were available, Plaintiff did not request one in lieu of permanent disqualification from the FSP and cannot avoid permanent disqualification.  The disqualification imposed was neither arbitrary nor capricious.  Wong, 859 F.2d at 132.

//

//

//

//

//

//

//

//

//

//

40

## CONCLUSION

In accordance with the foregoing,

(1)   Defendant United States' Motion For Summary Judgment, (Doc. 31), is GRANTED;

(2)   the Final Agency Decision, dated February 21, 2008, by the Food and Nutrition Service of the United States Department of Agriculture is AFFIRMED; and

(3)   The case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 28, 2009.



/S/ Helen Gillmor
_____
Helen Gillmor
Chief United States District Judge

YOUNG CHOI INC. dba KING'S MARKET & LIQUOR v. THE UNITED STATES OF AMERICA, CV 08-00101 HG LEK, Order Granting Defendant's Motion for Summary Judgement and Affirming the United States Department of Agriculture, Food and Nutrition Service's Final Agency Decision, Dated February 21, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

YOUNG CHOI INC. dba KING'S    )        CIVIL NO. 08-00101 HG LEK
MARKET & LIQUOR,              )
                             )
           Plaintiff,        )
                             )
        vs.                  )
                             )
THE UNITED STATES OF AMERICA, )
                             )
           Defendant.        )


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND
AFFIRMING THE UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD AND
NUTRITION SERVICE'S FINAL AGENCY DECISION, DATED FEBRUARY 21,
2008**

Plaintiff Young Choi, Inc., owner of King's Market & Liquor,
brought this action for judicial review of the administrative
decision by the Food and Nutrition Service of the United States
Department of Agriculture to permanently disqualify Plaintiff
from participation in the Food Stamp Program ("FSP") under the
Food Stamp Act, 7 U.S.C. §§ 2011-2036 for trafficking in food
stamps.

Defendant United States of America seeks summary judgment,
based on the administrative record, requesting a ruling that
Plaintiff violated the Food Stamp Program and that the sanction
imposed was appropriate.  (Memo. in Support of Motion for Summary
Judgment at 2, Doc. 31.)

For the reasons set forth below, the Court GRANTS
Defendant's Motion for Summary Judgment.

1

## PROCEDURAL HISTORY

On June 3, 2008, Plaintiff filed the Second Amended
Complaint.  (Doc. 12.)

On June 9, 2008, Defendant filed an answer.  (Doc. 14.)

On July 3, 2008, Defendant filed the administrative record.
(Doc. 17.)

On November 21, 2008, Defendant filed a Motion For Summary
Judgment, (Doc. 31), and a Separate and Concise Statement Of
Facts In Support, (Doc. 32).

On January 14, 2009, Plaintiff filed the Disclosure Of
Expert Testimony, (Doc. 40.), and the Declaration Of Frank K.
Abou-Sayf, PhD Re Expert Testimony Report, (Doc. 41).

On January 22, 2009, Plaintiff filed an Opposition to the
Defendant's motion for summary judgment.  (Doc. 42.)

On January 23, 2009, Plaintiff filed a Separate And Concise
Statement Of Facts In Support Of Plaintiff's Opposition.  (Doc.
43.)

On January 29, 2009, Defendant filed a Reply brief.  (Doc.
29.)

On February 9, 2009, the matter came on for hearing.

## BACKGROUND

### I. The Food Stamp Program

The Food Stamp Program ("FSP") is a welfare program that
allows low-income households to use coupons to purchase food from

authorized retail food stores.  7 U.S.C. § 2013(a).  The
Secretary of Agriculture issues regulations for the FSP and the
Department of Agriculture's Food and Nutrition Service ("FNS")
administers the program.  7 U.S.C. § 2013(c); Thabit v. United
States Department of Agriculture, 2003 WL 1798302, at *4
(N.D.Cal. April 3, 2003).

Stores participating in the FSP must follow the regulations
of the program set in the *Code of Federal Regulations's*
"*Participation of Retail Food Stores, Wholesale Food Concerns and
Insured Financial Institutions*."  See 7 C.F.R. § 278.  An
authorized store may only accept coupons from eligible households
in exchange for eligible food.  7 C.F.R. § 278.2(a).  Trafficking
food stamps is a violation of the program that involves "the
buying or selling of coupons, ATP cards or other benefit
instruments for cash or consideration other than eligible food
items."  7 C.F.R. § 271.2.  FNS may disqualify an authorized food
store from the program or impose a civil money penalty on a store
if FNS's on-site investigations, inconsistent redemption data, or
transaction reports under an EBT system shows that a store
violated the FSP.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a)

FNS officers investigate possible food stamp violations
according to the guidelines outlined in the agency compliance
handbook.  Ameria Corp. v. Veneman, 347 F.Supp. 2d 225, 226
(M.D.N.C. 2004).  The compliance handbook is not a rule or

regulation of government agency that the government needs to disclose during judicial review.  See id. at 226-27 (denying motion to order government to produce compliance handbook in judicial review of government's finding that store trafficked in food stamps).

At the start of an administrative case, the local or regional FNS field officer sends the store a charge letter stating that FNS investigated the store for possible food stamp violations and detailing each alleged violation.  7 C.F.R. § 278.6(b).  FNS provides the store the opportunity to explain the transactions in question before FNS makes a final administrative determination.  7 C.F.R. § 278.6.  The store may submit information, explanations, or evidence concerning any instance of alleged noncompliance within ten days of receiving the charge letter.  Id.  In making its final decision, the regional FNS office reviews the letter of charges, the store's explanations, the nature and scope of the violations, any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and evidence that shows the firm's intent to violate the regulations.  Id.

A store disqualified or fined under the FSP may file a written request for an administrative review within ten days of receiving notice of the FNS's action.  7 C.F.R. § 279.1.  The lower administrative decision is suspended while the

4

administrative review officer reviews FNS's determination.   7
C.F.R. § 279.4.   The reviewing officer considers information
submitted by FNS, the store, and any other person who has
relevant information on the case.   7 C.F.R. § 279.4.   To
establish that a store violated the regulations of the FSP, FNS
must provide administrative records that show that the authorized
food store accepted food stamp coupons as payment for ineligible
items.   Wehab v. Yeutter, 743 F.Supp. 1353, 1357 (N.D.Cal. 1990).
The reviewing officer may uphold FNS's decision to disqualify or
fine a store if the store cannot reasonably explain the
suspicious patterns in the store's transactions.   See Kahin v.
United States, 101 F.Supp.2d 1299, 1301 (S.D.Cal. 2000)
(reviewing officer upheld disqualification as store could not
explain the difference in low inventory value and high food stamp
redemption, or provide store records to confirm alleged large
orders).

## II.   **Electronic Benefit Transfer Program**

In Hawaii, the Food Stamp Program utilizes an Electronic
Benefit Transfer ("EBT") system, and food stamp benefit
recipients obtain their benefits through an EBT card.   The
plastic EBT cards have magnetic strips encoded with a card number
that is linked to the recipient's data.   A recipient uses an EBT
Card to pay for eligible food purchases at an authorized retail
food store by inserting the card into a point-of-sale device and

entering a personal identification number.

In an EBT transaction, a cashier rings up the total food purchase and swipes the food stamp recipient's card through the point-of-sale device.  The recipient verifies the amount that will be debited from the account and enters their personal identification number to authorize the debit.  The cashier next enters the amount of eligible food purchased.  The point-of-sale device transmits the information on the sale to an associated host computer.  The associated host computer is a central database that processes and stores the information.

If the EBT system authorizes the purchase, the purchase amount is debited from the recipient's account and credited to the retailer.  A receipt is then printed showing the store number, the recipient's identification number, the amount of purchase, whether or not it was approved, and the balance of the recipient's account.

The EBT system enables the FNS to track benefits from the recipient to the retailer, recording information on each benefit transaction.  The stored electronic data includes the recipient's card number, the amount of the food stamp purchase, the store number, and the date and time of the transaction.  The electronic data logged provides a tool for identifying the type and pattern

of transaction indicative of food stamp trafficking.[1]

The Food Stamp Act expressly provides for the use of evidence obtained through a transaction report under an electronic benefit system.  7 U.S.C. § 2021(a).

## III. **Plaintiff's Disqualification from the FSP**

Plaintiff Young Choi, Inc., is the owner and operator of King's Market & Liquor ("King's Market").  According to Plaintiff King's Market, it caters to the Micronesian community and sells food in bulk.  (Opp., Choi Decl. at ¶ 6, Doc. 42; Plaintiff's Separate Concise Statement of Facts in Opposition ("Pl. SCSF") at 2, Doc. 43.)  Plaintiff claims the top selling products at King's Market's include canned corned beef, chicken, pork, spam, vienna sausages, and 50lb. bags of rice.  (Administrative Record ("AR," at 176, Choi letter to FNS, Doc. 17.)  King's Market also states that it serves as a neighborhood convenience store that sells liquor and tobacco.  (Pl. SCSF at 2, Doc. 43.)

Defendant authorized King's Market to participate in the FSP on March 5, 2003.  (Alert Investigation Explanatory Notes ("Notes"), AR at 81.)  The FNS computer program known as the

---

[1]As stated in the Code of Federal Regulations:
Trafficking means the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food; or the exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of Title 21, United States Code, for coupons.

7 C.F.R. 271.1

ALERT[2] program identified King's Market as a target for investigation based on a suspicious pattern of transaction activity.  The ALERT program identifies patterns such as multiple withdrawals from the same food stamp recipient accounts within short periods.  (<u>Id.</u>)  After the ALERT system identified King's Market as a store to be investigated, the Honolulu Field Office of the FNS analyzed King's Market's transaction history for March, 2007, through August, 2007, and determined that "suspicious patterns of transactions indicating a likelihood of trafficking of food stamp benefits."  (<u>Id.</u>)  Large consecutive transactions from the accounts of more than one food stamp recipient, multiple transactions from the same household accounts, depletion of food stamp benefits through large purchases, and high dollar food stamp transactions showed that King's Market was engaged in food-stamp trafficking.  (<u>Id.</u>)

Defendant conducted an ALERT site visit and FNS Store Survey on September 27, 2007.  Defendant's Officer-in-Charge, Van Cullumber ("OIC Cullumber") and Jane Dedrick, a FNS Program Specialist, conducted the inspection of the store, with the consent and cooperation of In Soo Choi, President of Young Choi Inc., and Hee Jung Choi, Secretary of the corporation.  (AR at 222-225.)  OIC Cullumber reported that during the investigation,

---

[2]The ALERT program is the **A**nti-fraud **L**ocator using the **E**lectronic Benefit Transfer **R**etailer **T**ransactions program.  (AR at 81.)

he observed that King's Market is small, occupying about 1800 square feet, has only two cash registers and point-of-sale devices, limited counter space consisting of one 3' x 3' counter, no shopping carts, and only twelve shopping baskets. (Store Survey, AR at 222-225.)  The Market is located within eight blocks of two homeless shelters.  (<u>Id.</u>)  OIC Cullumber found that on September 27, 2007, the Market stocked 40 boxes of frozen meat, pork and poultry items for sale in upright freezers; and had a good stock of canned meat and seafood.  The Market, however, had a limited supply of fresh produce, eggs, and dairy products; and no fresh meat, seafood or poultry.  (<u>Id.</u>)  The larger  8' x 20' freezer in the back of the store contained very few frozen items.  (<u>Id.</u>)

A large number of the transactions being investigated by the FNS were sales for food in amounts that were multiples of $34.99, and Defendant looked for eligible food items at King's Market that sold for that amount.  OIC Cullumber reported that there were none.  (<u>Id.</u>)  The bulk foods that were sold consisted of meat and poultry sold at prices that did not match the $34.99 amount, including a case of canned corned beef for $35.99.

OIC Cullumber observed the King's Market had an excellent stock of ineligible items, including liquor, and a display case 7' tall x 24' wide fully stocked with beer and wine.  King's Market also had a stock of ineligible tobacco, clothing, and

9

other household items.  (Id.)  The FNS inspection did not find

any half or whole cases of canned corned beef.  The only cans of

corned beef seen were loose cans on one store shelf.  (Motion,

Declaration of OIC Van Cullumber ("Cullumber Decl.") at 3, Doc.

31.)  FNS concluded from the observations made during the on-site

store investigation and conversation on September 27, 2007, with

the owners that the store size, food stock, and prices were

inconsistent with the large purchases recorded by the EBT system.

(Id. at 3; Store Survey, AR at 225.)

On October 1, 2007, OIC Cullumber sent a letter of charges

to Plaintiff, detailing the reasons FNS believed the store had

violated the FSP regulations and was trafficking in food stamps.

(Charge Letter, AR at 198-199.)  The Defendant found that 426

transactions for $100 or more indicated food stamp trafficking by

the Market.  (Notes, AR at 82.)  The Charge Letter outlined the

suspicious transactions as including:

> 1. multiple withdrawals made from the accounts of
> multiple food stamp households within an unusually
> short time frame;
>
> 2. multiple withdrawals made from a single account
> within an unusually short time frame;
>
> 3. the completion of food stamp transactions that
> depleted the majority or all of a recipient's monthly
> food stamp benefit in an unusually short time frames;
> and
>
> 4. excessively large withdrawals made from the accounts
> of the food stamp recipients.

(Charge Letter, AR 198-199 "Government's four findings".)

10

FNS notified Plaintiff that Plaintiff could respond to the charges and request a civil money penalty within ten days of receiving the charge letter.  (Id.)

Plaintiff orally responded to the charges during a telephone call on October 3, 2007.  Young Sung Choi, son of the President of the corporation, denied that any employee of King's Market was involved in food stamp trafficking.  (Notes, AR at 87.)  Young Sung Choi explained that the large number of EBT transactions seen in re-occurring amounts in the charge letter resulted from the sale of multiple cases of canned corned beef at the price of $69.98 each.  When questioned about a single EBT transaction on July 3, 2007, in the amount of $1,259.64, Young Sung Choi maintained the transaction was for eighteen whole cases of canned corned beef at $69.98 per case.  (EBT Production System Balance Inquiry, AR at 96; EBT Exception Report, AR at 290.)

According to Young Ah Choi, daughter of the corporation's President, King's Market normally divided the $69.98 whole cases into half cases of 12 cans each.  The half case was then sold for $34.99.  (Notes, AR 86-86.)  The cases were repackaged into half cases because the weight of a whole case, 17.25 lbs., was too much for one person to carry.  (Id.)

Young Sung Choi went on to explain the instances where recipients purchased large dollar amounts and depleted the balances on their EBT cards.  He maintained that customers would

11

request the owners to deplete their balances, paying the remainder in cash if the purchase of food exceeded the balance. (Id.)  Plaintiff states the types of food stocked by King's Market and the customer service provided by the store is the reason King's Market has many dedicated food stamp customers, including homeless individuals.  (Id. at 88.)

The FNS Field Office requested receipts and invoices of items purchased for King's Market and cash register tapes for the period from March, 2007 through August, 2007.  (Id.)  On October 11, 2007, Plaintiff provided some invoices for corned beef purchases, cash register receipts, and Hawaii General Excise Tax Returns to justify some of the questioned EBT debits. (Notes, AR at 87; Notice Of Permanent Disqualification Letter, dated November 9, 2007 ("Disqualification Letter"), AR at 153.)  With the consent of Plaintiff, FNS conducted another on-site investigation of the Market on October 11, 2007.  (10/11/2007 Store Survey, AR 159-164.)  There were no cases or half cases of corned beef in stock.  The only bulk food items for sale observed on the October 11, 2007, inspection were boxes of frozen meats ranging in price from $10.99 to $40.99.  (AR at 11.)

The FNS Field Office verified that many of the Market's customers who purchased food with EBT cards were homeless. (Notes, AR at 82-85 and 88.)  Defendant confirmed that the Institute for Human Services (IHS), a homeless shelter located

12

near the store, did not allow homeless individuals residing at IHS to bring in any food or store any food at the shelter. (IHS Program Services pamphlet and Conversation Records, AR 155-157.)

Defendant obtained information on EBT purchases made by food stamp recipients who are listed as homeless and examined EBT transactions made by these recipients. The FNS observed large dollar transactions made by homeless recipients. The FNS Notes include several examples, including a homeless individual living at IHS, and a homeless family living on the beach. On March 5, 2007, a homeless individual residing at IHS received food stamp benefits of $240.00. On March 6, 2007, the individual's EBT account was debited $209.94 for six half cases of canned corned beef at King's Market. (Notes, AR at 83.)

On May 31, 2007, a homeless family of nine living on the beaches of Oahu purchased eighteen half cases of canned corned beef at a price of $629.82. The purchase reduced their benefits of $1,296.00 by nearly half. Five minutes later, the family's EBT card was debited a further $174.95. A few days later on June 8, 2007, the account was debited $629.82 for eighteen half cases of canned corned beef, and again five minutes later for $349.99. A month later, on July 3, 2007, the account was debited by $1,259.64, the sale price of thirty-six half cases of canned corned beef. (Notes, AR at 83.)

After evaluating Plaintiff's reply and submissions the Food

13

and Nutrition Service (FNS) was not persuaded.  Defendant FNS
concluded that Plaintiff committed the violations outlined in the
Charge Letter.  (Notes, AR at 89.)  On November 9, 2007, FNS sent
a letter notifying Plaintiff that King's Market had been
permanently disqualified from the Food Stamp Program for
trafficking violations.  (Disqualification Letter, AR 153-154.)
Plaintiff did not request a civil money penalty in lieu of
permanent disqualification.  (Id.)

On November 19, 2007, Plaintiff submitted a timely request
for an administrative review of Defendant's decision to
permanently disqualify Plaintiff from participation in the FSP.
(Final Agency Decision, AR at 8.)

On February 21, 2008, the administrative review branch of
the U.S. Department of Agriculture, Food and Nutrition Service
issued a Final Agency Decision upholding: (1) Defendant's finding
that Plaintiff had violated the Food Stamp Act, and (2) the
decision to permanently disqualify Plaintiff from the FSP.
(Final Agency Decision, AR at 7-14.)

Pursuant to Section 14 of The Food Stamp Act (7 U.S.C. §
2023) and 7 C.F.R. 279.7 of the Code of Federal Regulations,
Plaintiff filed a timely claim on March 18, 2008, seeking
judicial review of the Administrative Review's Final Agency
Decision to permanently disqualify Plaintiff from participating
in the FSP.  (Complaint, Doc. 1.)  Plaintiff argues that

14

Defendant's evidence does not establish misconduct.  (Id. at 3.)

### STANDARD OF REVIEW

A grocery store fined or disqualified under the FSP after an administrative review may file a complaint in the federal district court to challenge the administrative review officer's decision that the store violated the FSP.  7 U.S.C. § 2023(a)(13).  If the administrative action is invalid, the court will enter a "judgment or order as it determines is in accordance with the law and the evidence."  7 U.S.C. § 2023(a)(16).  A judicial review of an administrative decision involving the FSP "[i]nvolves two questions: (1) Did the violation occur? and (2) Is the penalty valid?"  Plaid Pantry Stores, Inc. v. United States, 799 F.2d 560, 563 (9th Cir. 1986).

### I. Review of FSP violation

"The suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue."  7 U.S.C. § 2013(a).  District courts in the Ninth Circuit review the validity of FNS's finding that a store violated the FSP by a trial de novo.  7 U.S.C. § 2023(a)(15); Wong v. United States, 859 F.2d 129, 132 (9th Cir. 1988).  Unlike the "substantial evidence" standard under the Administrative Procedure Act, the court can look beyond the administrative record and reach its own factual and legal conclusions in a trial de novo.  Kahin, 101

F.Supp.2d at 1302 (citing <u>Ramirez v. United States</u>, 514 F.Supp. 759, 763 (D.P.R.1981)).  A trial *de novo* satisfies procedural due process because the parties are not limited to the contents of the administrative record.  <u>Kim v. United States</u>, 121 F.3d 1269, 1274 (9th Cir. 1997).

In a trial *de novo*, the burden of proof shifts, "[a]nd plaintiffs must establish by a preponderance of the evidence that the violations did not occur." <u>Lopez v. United States</u>, 962 F.Supp. 1225, 1228 (N.D.Cal. 1997) (citing <u>Goodman v. United States</u>, 518 F.2d 505, 511-12 (5th Cir. 1975)).

## II. <u>Severity of the Penalty</u>

District courts in the Ninth Circuit apply *de novo* review to FNS's finding that a store violated the FSP, but an arbitrary and capricious standard to the FNS's sanction imposed on a store. <u>Wong</u>, 859 F.2d at 132; <u>Lopez</u>, 962 F.Supp. at 1230.  If the court finds a valid violation under the FSP, it reviews the penalty FNS imposed on the store based on an arbitrary and capricious standard.  <u>Id.</u>  The court examines the penalty "[i]n light of the administrative record to judge if the agency properly applied the regulations; to determine whether the sanction is 'unwarranted in law . . . or without justification in fact' (citation omitted)." <u>Plaid Pantry Stores, Inc.</u>, 799 F.2d at 563.  The court may impose a different penalty if it finds that a sanction is unwarranted in law or without justification in fact.  <u>Wehab</u>, 743 F.Supp. at

16

1358.

FNS may permanently disqualify a store from the program for a third disqualification, or a first or subsequent occasion "[o]f a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store." Id. In lieu of a permanent disqualification, FNS may impose a civil money penalty of up to $20,000 for each violation, but no more than $40,000 for a single investigation. Id. To request a fine rather than endure permanent disqualification, the store must submit, within ten days of receiving the charge letter, substantial evidence that the store had an effective policy to prevent violations of the FSP. Id. The evidence must show that the store owner "[w]as not aware of, did not approve of, did not benefit from, or was not involved in the conduct of the violation." Id. The evidence must also show that "[t]he management was aware of, approved of, benefitted from, or was involved in the conduct of no more than 1 previous violation by the store." Id.

## III. <u>Summary Judgment</u>

On motion for summary judgment, the moving party retains the burden of showing that there is no genuine issue as to material fact and that it is entitled to judgment as a matter of law. Lopez, 962 F.Supp. 1225 at 1228. The burden initially lies with the moving party to identify for the court "those portions of the

17

materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  FNS does not need to provide evidence that a store was caught "red-handed" engaging in a food stamp violation in the summary judgment stage. Kahin, 101 F.Supp.2d at 1303.  The court may grant the government's motion for summary judgment based on evidence from transaction reports.  Id. at 1304.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  To defeat a motion for summary judgment, the nonmoving party needs to raise material issues of fact to every alleged violation charged against it.  Kahin, 101 F.Supp.2d at 1303.  Although the nonmoving party does not need to demonstrate by a preponderance of the evidence that the violations in question did not occur, it must produce at least some "significant probative evidence tending to support the complaint" must be produced.  First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); Thabit, 2003 WL 1798302, at *4.  The nonmoving party may offer declarations or exhibits as new evidence to raise material issues of fact for each transaction

18

FNS alleges as suspicious.  <u>Kahin</u>, 101 F.Supp.2d at 1303.

Generalized and somewhat more specific assertions may not show

disputed issues of material fact to rebut the specific statements

and observations of investigators.  See <u>Thabit</u>, 2003 WL 1798302,

at *4 (generalized assertion that a violation was against policy

and the somewhat more specific assertion that there was no

surplus in the cash register failed to show a disputed issue of

material fact).

**<u>ANALYSIS</u>**

I.   **<u>Defendant Is Entitled To Summary Judgment On The Issue of
     Plaintiff's FSP Violation</u>**

Plaintiff's store, King's Market, has been permanently

disqualified by FNS because they found that Plaintiff trafficked

in food stamps.  Pursuant to 7 U.S.C. § 2021(b)(3)(B), permanent

disqualification is required "on the first occasion or any

subsequent occasion of a disqualification based on the purchase

of coupons or trafficking in coupons or authorization cards by a

retail food store."  In order to establish that Plaintiff

violated the regulation, the Defendant must show that Plaintiff's

store redeemed food stamp coupons for consideration other than

eligible food.  <u>Wehab</u>, 743 F.Supp. at 1357.

FNS relied on EBT electronic data documented in the

administrative record as a basis for finding that Plaintiff

violated the FSP by engaging in the trafficking of food stamp

benefits.  The administrative record shows that Defendant

19

submitted 426 transactions recorded at Plaintiff's store between March, 2007, and August, 2007, that show rapid and multiple transactions, large withdrawals, and transactions that depleted customers' available food stamp balances.

Reports from two on-site investigation visits of Plaintiff's Market also support FNS's position that Plaintiff engaged in trafficking in food stamps.  The on-site evaluation reports note that the store's small size, limited counter space, two cash registers and EBT devices, twelve shopping baskets, and lack of shopping carts would limit the size and speed of transactions. (Store Survey, AR at 222-225.)  The prices, stock of foods, and size of the Market are inconsistent with the excessively high number of large EBT transactions.

As Defendant has met its initial burden, the burden now shifts to Plaintiff.  In order to preclude summary judgment, Plaintiff must raise material issues of fact as to each of the violations charged against King's Market.  See Kahin, 101 F.Supp.2d at 1303.

Plaintiff has failed to provide evidence to explain the more than 400 suspicious transactions.

**A.   Electronic Benefit Transfer Transactions**

Plaintiff's first argument, that Defendant may not properly rely on the EBT sales transactions in making its determination that Plaintiff violated the FSP, is unpersuasive.  The law is

clear that FNS may base its finding of a violation on analysis of EBT transaction reports or on-site store surveys.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a)[3]; see Kahin, 101 F.Supp.2d at 1303 (affirming FNS's finding that store trafficked food stamps based on irregular and inexplicable patterns in EBT data and the volume of transactions compared to store inventory).

The administrative review officer correctly concluded that the use of EBT data and information obtained during the two store visits "is as valid a means of establishing facts as direct evidence obtained through an on-site investigation and the eye witnessing of trafficking."  (Final Agency Decision, AR at 10.)

**B.   Micronesian Customers and the Inventory of Corned Beef**

Plaintiff next argues that the pattern of transactions is explained by the ethnic background of the Market's customers.  In his Declaration, In Soo Choi asserts the questioned transactions occurred largely because his Micronesian customers eat canned corned beef and prefer to purchase the canned meat in large quantities.  (Opp., Choi Decl. at ¶ 6, Doc. 42.)  Choi's Declaration presents no facts directly rebutting the observations

---

[3]7 C.F.R. § 278.6 of the FSP regulations, which establishes the authority upon which FNS may disqualify any authorized retail food store, reads, in part:

Such disqualification shall result from a finding of a violation on the basis of evidence that my include . . . evidence obtained through a transaction report under an electronic benefit transfer system.

and analysis of FNS's investigators.  Choi merely presents
general justifications for large expenditures.

A similar argument was unsuccessfully put forward in the
case of Kahin v. United States, 101 F.Supp.2d 1299 (S.D.Cal.
2000).  Kahin also involved a store's permanent disqualification
from the food stamp program based on evidence of irregular and
inexplicable patterns in EBT data.  In Kahin, the FNS identified
EBT transactions occurring at plaintiff's grocery store revealing
"(1) rapid, repetitive electronic debits in unreasonable time
periods, (2) excessively high numbers of EBT debits of round
dollar amounts, (3) a high number of balance depletion
transactions, and (4) electronic card debits in large dollar
amounts."  Id. at 1300.  The charge letter noted that the FNS had
verified that the store was a small one, as is King's Market.
The store in Kahin "had no shopping carts, one cash register and
limited stock which could not sustain the type of transactions
recorded in the EBT data." Id.

The Kahin plaintiff argued that the suspect EBT data was a
result of "somewhat unusual purchasing patterns" of its Somali
customers.  Plaintiff alleged that the questionable transactions
were a consequence of Somali customers telephoning the store with
their orders at the beginning of the month.  Several families
then arrived at the store together, sharing transportation, to
pick up their pre-packaged groceries.  The simultaneous arrival

22

resulted in rapid, repetitive transactions.  Id. at 1301.
Plaintiff also alleged that the "Somali families are unusually
large, purchase food products in bulk, and purchase their entire
monthly food supply at the beginning of the month when the food
stamps are first available; thereby explaining the large
transactions and balance depletions."  Id.

The court in Kahin found the arguments to be insufficient
upon judicial review.  The court stated that in order to avoid
summary judgment, plaintiff had to raise material issues of fact
as to each of the violations charged against the store.  The
Plaintiff in Kahin argued that "the FNS's failure to produce
evidence indicating that [the] store was caught 'red-handed'
engaging in food stamp or EBT card fraud precludes summary
judgment."  Id.  The Kahin court rejected the assertion and
determined that while Plaintiff's explanations about the spending
patterns of his Somali customers tended to negate some of the
inferences from the EBT data, they did not sufficiently account
for all the suspicious activity.  Id.

Here too, the arguments about the shopping and eating
patterns of Micronesian people are insufficient to preclude
summary judgment.  Plaintiff's explanations focus on the sale of
corned beef to Micronesian customers.  The ethnicity of King's
Market's customers does not sufficiently account for all the
questioned transactions.  Ethnicity does not explain, for

23

example, why many rapid consecutive purchases were made by the same recipient.  Plaintiff asserts the consecutive purchases resulted from balance checks, where the recipient would purchase some food in order the check the balance on their EBT card, followed by another purchase when the balance allowed the sale. The explanation does not provide for the several transactions where the first purchase was in an amount well over $100, and was followed almost immediately by another transaction over $100.

The administrative review officer noted one such set of transactions where the recipient "made an initial transaction of exactly $120 followed only 1 minute 37 seconds later by a transaction for exactly $100."  (AR at 12.)  The two transactions were not in amounts that were multiples of $34.99, the price of a half case of corned beef.  The transactions also did not occur far enough apart in time.  The recipient, after completing the first purchase, would have had to pick up additional cases of canned corned beef and other food in a store with no carts in time to complete a second EBT transaction within 97 seconds. Plaintiff fails to provide specific facts showing how such sales could have occurred in a store where the transaction time alone was observed to take five minutes for a purchase of goods totaling $100 or more.  (Store Survey, AR at 222.)

Plaintiff proffers a receipt showing King's Market purchased $63,294 of canned corned beef from a distributor in support of

24

the argument that ethnic sales explain the questionable transactions.  Plaintiff contends that the sale of the beef, sold at a markup price for a total of $65,762, shows that the transactions were normal purchases by Micronesian customers.  The Market's EBT sales during the March through August 2007, period total $207,381.  The corned beef sales do not account for the remaining EBT sales totaling $141,619.  (Final Agency Decision, AR at 11.)  The corned beef sales also do not account for the forty-two EBT transactions for $109.96, a number that is not a multiple of the canned corned beef price of $69.98 a case. (Notes, AR at 82.)  The FNS EBT data also shows that of the 426 questionable EBT transactions, only 228 can be attributed to the alleged bulk canned corned beef sales.  Plaintiff fails to offer any explanation for the remaining 198 questionable transactions. (Notes, AR at 89; Charge Letter, Attachment 7 at 212-221.)

The evidence submitted by Plaintiff to refute Defendant's charges falls far short of establishing legitimacy for a significant majority of the transactions questioned.  Plaintiff fails to meet its burden because it has not explained the transactions or raised a material issue of fact with respect to them.

### C.  **The Statistics Report**

Plaintiff proffers a statistical analysis report by Frank K. Abou-Sayf, PhD in support of the position that King's Market was

25

not involved in food trafficking.  (Statistical Report, Doc. 41

("Opinion Report".)  The Opinion Report offers no new evidence,

and fails to raise an issue of material fact for five separate

reasons: 1) it does not address the majority of the suspicious

transactions, 2) it is based on limited data, 3) it does not

directly refute the results of the Government's ALERT analysis,

4) it provides only conclusory statements rather than showing any

valid statistical analysis, and 5) it fails to address the

observations made by the Government during the on site inspection

of King's Market.

### 1.  The Majority of the 601 Transactions Relied On By The Administrative Hearings Officer Are Not Addressed

First, Dr. Abou-Sayf discusses a very limited number of the

suspicious transactions documented by the Government.  In the

attachments to the government's Alert Investigation Explanatory

Notes dated November 19, 2007, 601 transactions are flagged as

suspicious.  (11/19/2007 Notes, AR 81-150, "ALERT Notes".)[4]  Dr.

_____

[4]There is some confusion created as to what data the Opinion
Report references.  In the Opinion Report, Dr. Abou-Sayf states
that he discusses the data documented in the attachments to the
October 1, 2007 letter from the United States Department of
Agriculture to In Soo Choi.  (See Opinion Report at 2, Doc. 41,
referring to the 10/1/2007 Letter, AR 198-342.)  Dr. Abou-Sayf
identifies the data, however, as being labeled "'Hawaii EBT
Production System - Balance Inquiry' dated 09/27/07 and hand-
labeled 'Att. B' through 'Att. K'" as the comparative reports
that he utilized in his examination.  The description matches the
documents attached to the ALERT Notes, found in the
administrative record at AR 81-150 ("Comparative Reports").
There are seventy-three EBT transactions at King's Market listed

Abou-Sayf refers to only seventy-three transactions.  The

remaining 528 transactions are not discussed.  To defeat a motion

for summary judgment, the nonmoving party needs to raise material

issues of fact to *every alleged violation charged* against it.

Kahin, 101 F.Supp.2d at 1303.  The Administrative Review Officer

based Plaintiff's disqualification from the FSP on each on the

601 transactions.  The Opinion Report fails to create an issue of

fact for all of the transactions, and summary judgment in favor

of the Government is warranted.

### 2.   Limited Data

Second, in the introduction to the Opinion Report Dr. Abou-

Sayf states that the reliability of his analysis is undermined

because of the limited amount of data made available to him.

Specifically, he warns that "[a] thorough verification of many of

the Defendant's claims is not possible in many instances due to

the limited amount of data provided by Plaintiff [King's Market]

to Defendant."  (Opinion Report at 1, Doc. 41.)

### 3.   The EBT Data Analysis Is Not Addressed

Dr. Abou-Sayf's main assertion is that other methods of

statistical analysis of the limited data, substituted for the

ALERT analysis, may be used to call into question the

Government's findings *without ever directly refuting the EBT data

analysis*.  Dr. Abou-Sayf's central contention is unpersuasive.

---

in the Comparative Reports.

The Food Stamp Act expressly provides for permanent disqualification of a retail food store using EBT evidence alone to support a finding of trafficking.  See 7 U.S.C. § 2021(a) (explicitly recognizing the validity of relying on evidence garnered "through a transaction report under an electronic benefit transfer system"); see also 7 C.F.R. § 278.6(a) (a store may be disqualified on the basis of "evidence obtained through a transaction report under an electronic benefit transfer system.").

Courts have upheld a store's disqualification from the food stamp program based on an analysis of EBT system data, similar to the government's analysis here.  Idias v. United States, 359 F.3d 695, 698 (4th Cir. 2004) (upholding disqualification when the United States "presented evidence of a pattern of irregular and suspicious activity, including that (1) on several occasions, total food stamp debits exceeded the store's documented total sales; (2) total food stamp debits systematically exceeded the sales categorized as food stamp sales on the store's register tapes; and (3) large food stamp debits often occurred in quick succession, sometimes even using the same EBT card, despite the Supermarket's modest size."); Saleh v. United States, No. 02 C 8846, 2004 WL 549457, at * 1-3 (N.D.Ill. March 19, 2004) (upholding disqualification because "[t]he high number of high dollar value EBT transactions at [the store] was excessively high

28

for such a small store with few food stamp eligible items."); Kahin v. United States, 101 F.Supp.2d 1299, 1303-04 (S.D.Cal. 2000) (upholding disqualification of a small store with limited stock when there was "rapid, repetitive transactions to the same customer indicated in the EBT data.").

Dr. Abou-Sayf's assertion that other methods of statistical analysis are to be substituted for EBT analysis does not negate the government's findings.

### 4.   The Opinion Report Is Conclusory

In the remainder of the Opinion Report, Dr. Abou-Sayf discusses three of the Government's four findings, and a finding by the Administrative Review Officer, by analyzing a handful of the questioned food-stamp transactions.

### a.   Chi-Square Analysis Of Multiple Transactions

In the first section, Dr. Abou-Sayf discusses the Government's first finding that multiple withdrawals were made from the accounts of multiple foodstamp households within unusually short time frames.  (Gov. findings, 10/1/2007 Letter, AR 198; Opinion Report at 3, Doc. 41.)  Dr. Abou-Sayf states that he examined the finding using Chi-Square analysis.  He purports to provide the details of his analysis in Appendix 1 to the Opinion Report.

A Chi-Square goodness of fit test is one technique for testing a hypothesis, fitting a statistical model to observed

data.  For example, if a six sided die is fair, the expected
probability of rolling a 6 on any given toss is 1/6.  The
hypothesis that a die is fair might be tested against an
alternate hypothesis that the die has been weighted to favor
rolling a 6, using a Chi-Square test.  The die is then rolled to
obtain a sampling, or set of values.  After rolling the die a
number of times, the Chi-square value would tend to agree with
one hypothesis or the other.

     Here, the analysis completed by Dr. Abou-Sayf is
unpersuasive for several reasons.  First, it is unclear that he
is referring to relevant data because two of the transactions
listed in Appendix 1 to the Opinion Report are for transactions
that occurred in 2008, outside the relevant time period.
(Opinion Report at 6, Doc. 41.)

     Second, the Opinion Report never sets out a clear statement
of any alternative hypotheses being tested in the Chi Square
analysis.  The discussion implies that Dr. Abou-Sayf is assuming
that the occurrences of multiple transactions should be similar
at different stores, but implication is not enough.  A Chi Square
test is meaningless without an alternate hypothesis.

     Third, Dr. Abou-Sayf restates the Government's finding in
such an altered way that his analysis does not address the
finding.  In a straw man logical fallacy, Dr. Abou-Sayf states
that he analyzed the comparative reports of ten food stamp

recipients to verify "the claim that *more* multiple transactions by all 10 recipients within a short period of time *were made at King's Market than at other markets*." (Opinion Report at 3, Doc. 41; <u>see also</u> Hawaii EBT Production System - Balance Inquiry dated 09/27/07, Att. B through Att. K to the ALERT Notes, AR 81-150 ("Comparative Reports").) Dr. Abou-Sayf has rephrased the finding so that he is comparing instances of repetitive purchases by a single beneficiary with instances of repetitive purchases by the same recipient at other stores, and testing to see if more multiple purchases were made at other stores than at King's. This is not an examination of the Government's finding that multiple transactions were made by *multiple* food stamp recipients *at King's Market.*

The Government supports its finding with the transactions listed in Attachments 1 and 2 to the October 1, 2007, letter to In Soo Choi. The Attachments show multiple transactions made by multiple food stamp beneficiaries at King's Market. Dr. Abou-Sayf does not refer to the data in Attachments 1 and 2, using the data in the Comparison Reports instead. He analyzes multiple transactions by a single beneficiary, rather than multiple transactions by multiple beneficiaries. The transaction data consists of ten separate reports, each detailing the purchases made by an individual beneficiary at several different stores. (<u>See</u> Comparative Reports, AR 91-150; Opinion Report at 3 and 6-

31

8.)  Dr. Abou-Sayf is, because of his choice of data, analyzing a smaller set of transactions.  Listing multiple transactions by a single beneficiary forms a smaller set of data than multiple transactions by multiple beneficiaries.  The approach does not address the suspicious nature of the multiple transactions *at King's Market* relied on by the Administrative Review Officer in his decision.

Dr. Abou-Sayf argues that the data studied in isolation sheds light on the behavior of the purchasers.  He relies on the assumption that the other transactions reflect normal behavior on both the buyer's and the store's part, and concludes that the purchases at King's Market are a part of a normal pattern of reasonable shopping behavior simply because similar repetitive purchases occurred at other stores.  Dr. Abou-Sayf's reasoning is circular and unpersuasive.

Dr. Abou-Sayf also fails to set out the mathematical analysis behind his conclusions.  Appendix 1 contains insufficient detail to act as a proof of his assertions.  The Opinion Report Chi Square discussion is conclusory and fails to raise an issue of material fact.

## b.   Poisson Probability Distribution Analysis

In Dr. Abou-Sayf's second section, he purports to employ the Poisson Probability Distribution analysis to show that multiple transactions within short periods of time by a single food stamp

recipient are part of a normal shopping pattern.  Again, there is a problem as to the Opinion Report as it references forty-nine of the transactions listed in Appendix 2 to the Opinion Report that are for transactions that occurred in 2008, outside the relevant time period.  (Opinion Report at 9, Doc. 41.)

Even if a relevant period of transactions was analyzed, the theory is unpersuasive here.  In probability theory and statistics, the Poisson Distribution provides the means to calculate the probability for a certain number of events to happen in a set time period, given the events are discrete and occur independently.  For example, the expected number of car accidents on a particular highway over a certain period of time can be calculated, assuming relatively constant conditions. Similarly, Poisson Distribution can be used to determine the likely number of occurrences of a rare disease such as Leukemia in a certain population.

Poisson Distribution analysis is effective only when certain conditions are met, that is, 1) the number of events in two disjoint time intervals is independent; and 2) the probability of an event occurring during a small time interval is proportional to and only depends on the length of the time interval.  The Poisson Distribution is not applicable to situations where the events are not independent, such as the determination of the occurrences of AIDS in a population.  AIDS is an infectious

33

disease and so the contraction of AIDS by one person is not independent of the contraction of the disease by others.

The usefulness of any conclusions reached in a statistical analysis of any type of data depends on the quality of the data used and the assumptions made.  Here, the assumptions are deeply flawed.  Dr. Abou-Sayif assumes the two conditions, including independence, that would dictate using a Poisson Distribution for an analysis.

In particular, Dr. Abou-Sayif assumes that the occurrence of multiple transactions within five or ten minutes "is independent of the occurrence of another similar one." (Opinion Report at 9, Doc. 41.)  He gives no basis for the critical assumption.  Dr. Abou-Sayf fails to show that the purchases qualify as a Poisson process by fitting the transaction data to a Poisson distribution and demonstrating that any deviations from the distribution parameter are statistically reasonable.  The calculations are not given in the Report.  Nor does Dr. Abou-Sayf demonstrate in some other way that the two conditions of a Poisson process are met.

The Opinion Report is also unpersuasive because the data used includes purchases at large supermarkets, such as Foodland and Safeway, that have multiple cash registers, a large number of customers, and a much wider stock of goods than is found at King's Market.  In a Poisson process, data from other stores has no relevance to data from King's Market unless the stores are

34

similar.  Using data from stores that are not similar is, for example, like using the data from a highway to determine the probability of traffic accidents on a country road.  Here, the on site investigations of King's Market detail reasons why purchasing patterns at King's would *not* be the same as at the stores referred to in the second section of the Opinion Report. Unlike Foodland and Safeway, King's Market is a small 1800 square foot store with only two cash registers and point-of-sale devices, and a limited stock of food for sale.

Dr. Abou-Sayf fails to show mathematically that the suspicious transactions are independent purchases that reflect normal shopping behavior, rather than food trafficking.  There is nothing in the Opinion Report demonstrating that the multiple transactions are random, independent transactions.  Dr. Abou-Sayf's conclusory statements fail to raise an issue of material fact.

### c.   **Transactions Depleting Benefits**

In the third section of the Opinion Report, Plaintiff's expert discusses the Government's finding that King's Market completed food stamp transactions that depleted the majority or all of a recipient's monthly food stamp benefit.  (Opinion Report at 4, Doc. 41.)  Dr. Abou-Sayf's opinion on the Government's third finding is also unpersuasive.

The Government proffered evidence of 142 suspicious

depletion and near depletion transactions in support of their finding.  (EBT transactions, Attachments 5 and 6, 10/1/2007 Letter, AR 205-211.)  Dr. Abou-Sayf addresses none of them.

Dr. Abou-Sayf examines, instead, seven large purchases made at King's Market.  He then compares the transactions to seventeen purchases made at other stores.  The total of twenty-four purchases were made by two of the food stamp recipients.  Six transactions were completed by recipient Shaver at Safeway, and eighteen transactions by recipient Kam, including the seven at King's Market.  The seven King's Market transactions are not relevant as they are *not* transactions listed by the Government in support of the finding of suspicious depletion of benefits.

The Opinion Report does not address the suspicious transactions directly, and fails to give any explanation for the depletion transactions.  Dr. Abou-Sayf argues only that because other large purchases were made at other stores, the three large purchases at King's Market exhibit normal behavior.  His opinion is conclusory and unfounded.

Plaintiff must raise material issues of fact as to every alleged violation charged.  <u>Kahin</u>, 101 F.Supp.2d at 1303.  The Opinion Report fails to raise a material issue of fact regarding the 142 transactions that depleted the majority of a recipient's monthly food stamp benefit.  Each of the 142 flagged transactions is sufficient to warrant summary judgment in favor of the

Government.

### d.   <u>Excessively Large Withdrawal Transactions</u>

The final section of the Opinion Report discusses the
Administrative Review Officer's finding that a number of
recipient households spent substantially more of their food stamp
benefits at King's Market than at other stores and supermarkets.
(2/21/2008 Final Agency Decision at 5, AR 11.)   The
Administrative Review Officer found that the pattern of
recipients spending more of their allotment at the small King's
Market, than at supermarkets that carry more of a variety of
eligible foods, is indicative of unreasonable customer behavior.
<u>Id.</u>  Dr. Abou-Sayf agrees with the finding, stating that:

> Overall, the claim that some recipients spend
> substantially more at King's Market than at other
> markets is valid for 7 out of 10 recipients making up
> the comparative reports.  For the three others, more
> money was spent at King's Market half of the time,
> about three of the six months.

(Opinion Report at 5, Doc. 41.)

The Opinion Report fails to directly address the
Government's fourth finding, set out in the October 1, 2007,
letter to In Soo Choi, that a series of food stamp transactions
at King's Market resulted in excessively large withdrawals from
the accounts of food stamp recipients.  The Government proffered
426 suspicious excessive withdrawal transactions.  Dr. Abou-Sayf
fails to address the majority of them, discussing only the few

37

purchases listed in the Comparative Reports.

### 5.   The Analysis Fails To Address The On Site Observations

The Opinion Report only discusses the EBT data reports.  The Government's findings are not based on the EBT data analysis alone.  The Opinion Report does not consider the observations made by the Government during the on site inspections of King's Market, or the information gathered in the Government's investigation of the food stamp recipients who made the suspicious purchases.

The Opinion Report fails, for example, to explain why homeless food stamp recipients who live at IHS would buy large quantities of canned meat when they have no place to store food.

In Appendix 1 of the Opinion Report, Dr. Abou-Sayf examines multiple transactions made within four minutes by food stamp recipient Brown, a homeless family of nine living on the beaches of Oahu.  (Opinion Report at 6, Doc. 41.)  Dr. Abou-Sayf lists the family's multiple transactions at other stores, and concludes that the transactions show that Brown's multiple purchases on June 8, 2007, are part of a normal pattern of shopping behavior.

Dr. Abou-Sayf's conclusory report fails to explain why the Brown family would travel the long distance from the beaches in Waianae to King's Market in Kalihi to purchase 72 half cases of canned corned beef within a five week period from May 31, 2007,

38

to July 3, 2007.  (Notes, AR at 83.)

Nor does the Report explain how on March 15, 2007, a food stamp recipient made two purchases for $209.94 and for $104.97 within two minutes and twenty-three seconds, when the on site government inspectors observed that EBT transactions for $100 or more took five minutes in King's Market.  (Charge Letter, Attachment 3, AR at 203; Store Survey, AR at 222.)

Dr. Abou-Sayf's analysis does not establish an alternative explanation, other than food stamp trafficking.

The Court grants summary judgment in Defendant's favor as to the agency's finding that Plaintiff unlawfully trafficked in food stamps.

## II. __The Law and the Facts Support the Administrative Decision and the Sanction Imposed__

As the Court finds that Plaintiff violated the FSP, the court also examines the sanction Defendant imposed on Plaintiff. See Wong, 859 F.2d at 132.  FNS may permanently disqualify a retail food store from the Food Stamp Program if FNS's on-site investigations, inconsistent redemption data, or EBT transaction reports show that a store violated the FSP.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a).  A store may submit a request of a civil money penalty in lieu of permanent disqualification, within ten days of receiving the charge letter.  Id.  A store owner who does not timely request a civil money penalty in lieu of a permanent disqualification cannot avoid the permanent disqualification.

See 7 C.F.R. § 278.6(I); <u>United States v. Truong</u>, 860 F. Supp.
1137, 1141 (E.D.La. 1994).

In applying the arbitrary and capricious standard, the Court
finds that the agency's decision to permanently disqualify
Plaintiff from the FSP for trafficking in food stamps is
supported by the record.  The administrative record shows that
Plaintiff was engaged in multiple violations of trafficking from
March 2007 through August 2007.  In this circumstance, the
statutes and regulations require permanent disqualification.
Moreover, even if a civil monetary penalty were available,
Plaintiff did not request one in lieu of permanent
disqualification from the FSP and cannot avoid permanent
disqualification.  The disqualification imposed was neither
arbitrary nor capricious.  <u>Wong</u>, 859 F.2d at 132.

//

//

//

//

//

//

//

//

//

//

40

### CONCLUSION

In accordance with the foregoing,

(1)   Defendant United States' Motion For Summary Judgment, (Doc. 31), is GRANTED;

(2)   the Final Agency Decision, dated February 21, 2008, by the Food and Nutrition Service of the United States Department of Agriculture is AFFIRMED; and

(3)   The case is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 28, 2009.



/S/ Helen Gillmor
_____
Helen Gillmor
Chief United States District Judge

YOUNG CHOI INC. dba KING'S MARKET & LIQUOR v. THE UNITED STATES OF AMERICA, CV 08-00101 HG LEK, Order Granting Defendant's Motion for Summary Judgement and Affirming the United States Department of Agriculture, Food and Nutrition Service's Final Agency Decision, Dated February 21, 2008.